UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JOSE M. SANTOS, *et al.*,

                     Plaintiffs,

                 -against-

JOSEPH ZABBARA, *et al.*,

                     Defendants.

----------------------------------------------------------------x

**MEMORANDUM & ORDER**

11-CV-2516 (PKC)

PAMELA K. CHEN, United States District Judge:

      This case is all about chickens:  at the crack of dawn, officers from the Suffolk County Police Department (the "SCPD") searched Plaintiff Jose M. Santos's ("Santos") residence for "chickens," code for cocaine, and instead seized *actual* chickens.  (Dkt. No. 1 ("Compl.") ¶¶ 14-35; Dkt. Nos. 27-3–27-8 ("Defs. Exs."), Ex. D, at 115 ¶ 164, 117 ¶ 169.)  Santos, along with his wife and children (collectively, the "Plaintiffs"), brought suit under 42 U.S.C. § 1983 ("Section 1983") against several of the SCPD officers in the Narcotics Section[1] (the "Defendants") for their role in issuing and executing the warrant for this search and subsequent seizure,[2] claiming

---

[1]     These officers are Joseph Zabbara, Raul Mercado, Robert Strecker, and Calvin Powell. (Compl. ¶¶ 8-11.)

[2]     Plaintiffs also sued "John/Jane Doe(s)" from the SCPD and the Suffolk County Society for the Prevention of Cruelty to Animals (the "SCPA").  (Compl. ¶¶ 12-13.)  This Court, however, dismisses the Section 1983 claims against the "John/Jane Doe(s)" as time-barred, because Plaintiffs did not attempt to amend their Complaint by naming any of the "John/Jane Doe(s)" within the applicable three-year statute of limitations period.  *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) (holding that the Section 1983 claims against the individual officers were time-barred, in light of "[the plaintiff's] listing of ten 'John Does' in [the operative complaint], . . . because he did not know the arresting officers' names"

violations of their Fourth Amendment rights to be free from unreasonable searches and seizures.[3]

(Compl. ¶¶ 1, 37-44.)

Defendants now move for summary judgment dismissing Plaintiffs' Section 1983 claims

(the "Motion").  (Dkt. No. 27.)  This Court grants the Motion, for the reasons set forth below.

I.   Background

A.   *The Facts*[4]

On May 5, 2009, Judge James C. Hudson of the Supreme Court of New York, Suffolk

County ("New York Supreme Court"), issued a warrant to search the "entire premises" of

Santos's residence at 105 Homestead Drive in Coram, New York,[5] without knocking and

announcing prior to entry.  (Defs. 56.1 ¶¶ 1, 5.)  The search warrant described Santos's residence

as a two-story house with a tan-and-gray-stone exterior and covered patio with white columns,

---

and his filing of an amended complaint "identifying six police officers by name" only "after the
statute of limitations had run"), *modified on other grounds*, 74 F.3d 1366 (2d Cir. 1996); *see also
Tapia-Ortiz v. Doe*, 171 F.3d 150, 151-52 (2d Cir. 1999) (per curiam) ("Although [the plaintiff]
filed his complaint naming the defendant officers as 'John Does' within the three-year statute of
limitations period, '[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent
statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a
change in the party sued.'") (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.
1993)).

[3]      To be accurate, as Defendants are state and not federal officers, Plaintiffs' rights are
"under the Fourth Amendment, as applied to the States under the Fourteenth Amendment['s]
Due Process Clause." *Southerland v. City of N.Y.*, 680 F.3d 127, 132 n.1 (2d Cir. 2012)
(quotations omitted; modification in original).

[4]      This Court construes any disputed facts in the light most favorable to Plaintiffs, as the
non-moving parties, for purposes of the Motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144,
157-59 (1970) (Harlan, J.).  However, where Plaintiffs either (i) admit or (ii) deny without citing
to admissible evidence certain of the facts alleged in Defendants' Statement Pursuant to Local
Rule 56.1 (Dkt. No. 27-1 ("Defs. 56.1")), this Court shall deem any such facts undisputed.  *See*
Local Rules of the United States District Courts for the Southern and Eastern Districts of New
York 56.1(c)-(d).  Standalone citations to "Defs. 56.1" denote that this Court has deemed certain
of Defendants' alleged facts undisputed.

[5]      Coram is located in Suffolk County.

sitting on property surrounded by a chain-link fence. (Defs. Ex. C, at 1.) The search warrant was based on the affidavit submitted by Defendant Joseph Zabbara ("Officer Zabbara").[6] (*Id.* ¶ 1.)

The affidavit represented that an investigation by the SCPD, starting in July 2008, revealed a web of drug organizations in Coram involving various participants in the sale and resale of cocaine and prescription drugs. (Defs. Ex. D, at 54-56 ¶ 59, 159-60 ¶ 250.) This investigation also revealed that three of these participants were Santos's own brothers: Jose E. Santos ("Jose"), Guillermo Santos ("Guillermo"), and Danny Santos ("Danny") (collectively, the "other Santos brothers"). (*Id.* at 83 ¶ 103, 89-90 ¶ 117; Pls. Ex. G, at 16.)

According to the affidavit, the SCPD's investigation, through telephonic intercepts and direct surveillance, suggested that these drug organizations were operating out of several different properties. (Defs. Ex. D, at 159-60 ¶ 250.) The affidavit cited particularized findings from this investigation to support its theory that the organization to which the other Santos brothers belonged "operated, in part, out of [Santos's] residence at 105 Homestead [Drive], Coram, Suffolk County, New York"; and that this organization used Santos's residence "to store quantities of cocaine, to meet with other coconspirators and to conduct their sales of cocaine and prescription pills" (*id.* at 89-90 ¶ 117):

- On March 5, 2009, around 8 PM, the SCPD recorded a telephone call between Jose and Danny: the two brothers agreed to meet "over at Marcel's . . . where the roosters are,"[7] after Danny asked about "ten more hard." The SCPD confirmed

---

[6]    Defendant Raul Mercado ("Officer Mercado") suggested that he had assisted in drafting some of the affidavit, possibly the portions relating to Santos's residence. (Dkt. Nos. 28-1–28-4 ("Pls. Exs."), Ex. I, at 22-23.)

[7]    The SCPD subsequently seized fighting roosters from Santos's residence. *See infra.* Elsewhere, however, the affidavit cited conversations among other participants in the drug organization that referenced "chickens" as code for cocaine. (*See, e.g.*, Defs. Ex. D, at 116-17

this meeting by subsequently observing that Danny's car arrived at and departed from 105 Homestead Drive, and that Jose's car was already parked outside. According to the affidavit, the brothers met at Santos's, "aka Marcel's," residence, so that Jose could supply Danny "a quantity of crack cocaine, which they referred to as 'ten hard.'" (*Id.* at 82-84 ¶¶ 102-104.)

- On March 29, 2009, in the late afternoon, the SCPD recorded several telephone calls between Jose and Jorge Corona ("Jorge"). On the first call, Jorge reported that he had remaining "four balls, nine hard and thirteen softies," and Jose suggested that they would thus require more of the "hard." Both men agreed to "see each other at Marcel's." Shortly after Jorge arrived at "Marcel's," Jose said, on another call, "don't you guys go in there, get out." The affidavit represented that the two men were planning to meet at Santos's, "aka Marcel's," residence, because Jorge, who worked for Jose, had sold certain amounts of cocaine and specifically needed more crack cocaine. Jose, however, became worried about the police watching Santos's residence, and so he instructed Jorge to stay outside. (*Id.* at 84-86 ¶¶ 105-108.)

- On April 9, 2009, around 1:30 PM, the SCPD recorded a telephone call, during which Guillermo asked his brother Jose whether he was going "[t]o where Marcel is to pick up the stuff." The affidavit represented that the "stuff" referred to some "quantity of cocaine" at Santos's, "aka Marcel's," residence. (*Id.* at 86-87 ¶¶ 109-10.)

- On April 28, 2009, in the late afternoon and early evening, the SCPD recorded several telephone calls and text messages between Danny and Chris Caro ("Chris"), another alleged participant. Danny texted Chris saying, "I've got you 45 10s for now." Chris later called to see if Danny had "anything more than that tonight," and informed Danny that, although "I'll pick those up now, I'm definitely going to need more." The two men conversed again in an hour, at which time Danny directed Chris to turn left onto "Homestead drive." After Chris turned onto Homestead Drive, Danny said, "I'm at one oh five, just uh go down the road." According to the affidavit, Danny directed Chris to meet him at Santos's residence to pick up the "45 10s," meaning 45 Percocet pills. (*Id.* at 87-89 ¶¶ 111-16.)

The affidavit thus claimed that the SCPD had "probable cause" to search—among the properties implicated by this investigation—the residence at 105 Homestead Drive, which was "occupied by Jose M. Santos aka Marcel and other persons as yet unknown" but used by "Jose E.

---

¶¶ 168-69 ("Listen, the the chicken has been out since, since, since ten in the morning"; affiant opining, based on the investigation, that "chicken" refers to cocaine).)

Santos . . . and his co-conspirators" to operate their drug organization.  (*Id.* at 145 ¶ 224, 152-53 ¶ 239, 168 ¶ 264.)   Such a search could potentially produce relevant evidence, including (i) cocaine and prescription drugs, (ii) supplies for storing, weighing, and packaging these drugs, and/or (iii) proceeds and records from the sale of these drugs.[8]  (*Id.*)

Plaintiffs, however, allege that the affidavit omitted information showing that Santos "was not connected in any way to the alleged drug transactions or conspiracy," which they argue would have defeated the New York Supreme Court judge's probable cause determination (Dkt. No. 29 ("Pls. Br."), at 4-6):

---

[8]     New York law provides that "[t]he application [for a search warrant] may also contain[] . . . [a] request that the search warrant authorize the executing police officer to enter premises to be searched without giving notice of his authority and purpose, upon the ground that there is reasonable cause to believe that (i) the property sought may be easily and quickly destroyed or disposed of, or (ii) the giving of such notice may endanger the life or safety of the executing officer or another person[]."  N.Y.C.P.L. § 690.35(4)(b); *see also Richards v. Wis.*, 520 U.S. 385, 396 n.7 (1997) (Stevens, J.) ("A number of States give magistrate judges the authority to issue 'no-knock' warrants . . . . The practice of allowing magistrates to issue no-knock warrants seems entirely reasonable when sufficient cause to do so can be demonstrated ahead of time.").

To substantiate *no-knock* searches of Santos's residence and the remaining properties, the affidavit additionally represented that the specific drug organizations being investigated by the SCPD, including the one to which the other Santos brothers belonged, demonstrated a significant "degree of cautiousness"; for instance, these organizations only sold cocaine and prescription drugs to the participants' personal acquaintances.  (Defs. Ex. D, at 172-73 ¶ 271.)  The affidavit also represented that these organizations sold cocaine and prescriptions drugs which were "easily disposed [of]," and that their participants were characteristically "paranoid and suspicious."  (*Id.* at 174-75 ¶¶ 273-74.)   Finally, the affidavit represented that Danny, in particular, had participated in certain recorded conversations about obtaining a handgun.  (*Id.* at 174 ¶ 272.)

For these reasons, the affidavit claimed that "the objectives of this investigation could be jeopardized by giving advanced warning of the execution of these search warrants to the occupants of the previous described residence located at . . . [*inter alia*] 105 Homestead Drive, Coram, Suffolk County, New York."  (*Id.* at 172-73 ¶ 271.)  Specifically, "advanced warning" could result in relevant evidence being destroyed beforehand and also endanger the lives of the SCPD officers.  (*Id.* at 175 ¶ 275.)

- The SCPD recorded telephone calls on which Santos participated, including calls with the other Santos brothers.  None of these calls involved conversations regarding, or the use of code for, drugs.  (Pls. Ex. G, at 15-20.)

- The SCPD had not observed Santos at any of the "undercover buys" or "hand-to-hand transactions" during its investigation.  (*Id.* at 23, 31.)

- The SCPD's surveillance of Santos's residence and the store where Santos worked did not conclusively show that he was present for any drug-related "meets" at either location.  (*Id.* at 31-34, 47-48.)

- The SCPD lacked probable cause to arrest Santos on any basis relating to its investigation, before searching his residence, whereas it had probable cause to arrest the other Santos brothers "regardless of the search."  (*Id.* at 30-31, 36-37.)

- The SCPD reviewed records for Santos's bank accounts and wire transfers; these records were "inconclusive" as to any suspicious transactions which could suggest that he was concealing proceeds from the sale of drugs.  (*Id.* at 93-96.)

During his deposition, Officer Zabbara acknowledged the omission of the above information about the SCPD's investigation, but observed that such information was not "relevant to . . . establishing probable cause" to search Santos's residence.  (*Id.* at 20.)

On May 8, 2009, around 4:50 AM, Officer Mercado and Defendant Robert Strecker ("Officer Strecker"), along with other SCPD officers in the Narcotics and Emergency Services Sections, executed the previously-issued search warrant for Santos's residence, pursuant to a "tactical plan."[9]  (Defs. 56.1 ¶ 3; Defs. Ex. E, at 1-2; Pls. Ex. I, at 30.)  According to Officer Mercado, he and other officers in the Narcotics Section met ahead of time to review the "information that we would pass on to our emergency service section"—mainly, safety issues and objectives relating to this search—and relayed that information to the officers in the Emergency Services Section.  (Pls. Ex. I, at 30-32.)  The record reflects conflicting testimony

---

[9]     Defendant Calvin Powell ("Officer Powell") played no role in issuing or executing this search warrant.  (Defs. 56.1 ¶ 4.)  Accordingly, this Court dismisses all claims against Officer Powell, as they are *undisputedly* without any factual basis.

over whether Officer Mercado or Officer Zabbara controlled the logistics for safely and effectively carrying out this search.  (*Compare* Pls. Ex. I, at 30, 32 *with* Pls. Ex. G, at 59-60, 97.) On the actual day of this search, the officers in the Narcotics and Emergency Services Sections assembled 20 minutes in advance to make last-minute preparations.  (Defs. Ex. E, at 1.)

To execute the search warrant, the SCPD officers in the Emergency Services Section began by entering Santos's residence, without knocking or otherwise announcing their presence, and proceeded to secure the entire premises.  (Defs. Ex. E, at 2; Pls. Ex. I, at 32-33.)  According to Santos, these officers broke in and threw "bombs" that caused the floors to "come[] up" and dislodged the nails in the ceiling.  (Pls. Ex. H, at 44-45.)  These officers also aimed their guns at Santos and his wife and three children who were also at the residence.  (Defs. Ex. E, at 2; Pls. Ex. H, at 56.)  Santos also stated that the initial execution of the search warrant "messed up the house" and traumatized his children.  (Pls. Ex. H, at 44, 49.)

Only after the SCPD officers in the Emergency Services Section secured the entire premises did Officers Mercado and Strecker, along with other officers in the Narcotics Section, conduct the search itself.  (Defs. Ex. E, at 2; Pls. Ex. I, at 32-33.)  Officer Mercado and "one other detective" in the Narcotics Section, whose name Officer Mercado could not recall, continued the search into the backyard of Santos's residence.[10]   (Defs. Ex. F, at 42, 44.)  The backyard was approximately less than a half-acre in size.  (*Id.* at 50.)

In the backyard, Officer Mercado saw an extension cord that ran from the residence to an outdoor shed, which "seemed odd" and potentially the source of something illegal.  (*Id.* at 43.) Officer Mercado decided to search the shed.  (*Id.* at 44.)  Officer Mercado did not recall

---

[10]     Defendants, in their reply brief, concede that the "other detective" was Officer Strecker. (Dkt. No. 27-10 ("Defs. Reply"), at 5.)

"breaking into" the shed, and later recounted that he had been able to see the "roosters in the shed" from the outside.  (*Id.* at 44, 49.)  Upon entering the shed, Officer Mercado observed that the roosters were in boxes, and they had waddles which were "surgically removed" and wore bracelets with razors around their legs.  (*Id.* at 44-45.)  Based on these observations, and his experience on other investigations involving animal fighting, Officer Mercado concluded that these roosters "were the fighting type . . . for obvious reasons."  (*Id.* at 44-46; Defs. 56.1 ¶ 8.)

The SCPD arrested Santos solely for possessing fighting roosters on the premises.[11] (Defs. Ex. E, at 2.)  At the SCPD's request, the SCPA subsequently came and removed 14 of these roosters.  (Defs. Ex. E, at 3; Defs. Ex. F, at 47.)  The SCPD also seized two cellular telephones, cash, and a case of assorted papers from the kitchen and master bedroom inside Santos's residence.  (Defs. Ex. E, at 2-3.)  Ultimately, however, nothing that the SCPD seized supported the drug-related activities it had been investigating.  (Pls. Ex. G, at 25.)

### B. *Procedural History*

On May 25, 2011, Plaintiffs filed the Complaint in this "civil rights action" under Section 1983.  (Compl. ¶ 1.)  The Complaint claims that Defendants violated Plaintiffs' Fourth Amendment rights, alleging that (i) Officer Zabbara obtained the search warrant by submitting the affidavit which "contained information that Zabbara knew or should have known was false" and ultimately lacked probable cause (*id.* ¶¶ 14-16, 37-38); (ii) Defendants, when executing the search warrant without knocking or otherwise announcing their presence, "excessively searched" Santos's residence, in that they "forcibly entered the residence by breaking down the door," threw a "smoke bomb," and brandished their guns (*id.* ¶¶ 19-27, 39-41); and (iii) Defendants

---

[11]     Santos insisted at his deposition that "[m]y brother had [the roosters] there.  I don't know what he had them there for."  (Pls. Ex. H, at 47.)

searched the "backyard of the premises" and then unlawfully seized the roosters found in the shed (*id.* ¶¶ 32-34, 42).[12]

On July 21, 2011, Defendants answered the Complaint.  (Dkt No. 3, at 1.)  The "doctrines of qualified and/or absolute governmental immunity for discretionary acts" were among Defendants' affirmative defenses.  (*Id.* ¶¶ 20-24.)

On May 13, 2013, Magistrate Judge E. Thomas Boyle certified that discovery was complete.  (Dkt. No. 20.)  Accordingly, with this Court's permission, the parties proceeded to brief the Motion, pending before this Court.  (Orders, dated June 7, 2013 and June 12, 2013.)

---

[12]     The Complaint also appears to assert claims *directly* against Suffolk County, the SCPD, and the SCPA under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), based on purported "policies and customs" that violated Plaintiffs' Fourth Amendment rights.  (Compl. ¶¶ 45-49.)  These *Monell* claims, however, are not properly asserted, as none of these entities are even named as defendants in this case.  *See Pinero v. Casey*, No. 10 Civ. 4803, 2012 WL 832509, at *13 (S.D.N.Y. Mar. 13, 2012) (Francis, M.J.) (holding that "[t]he plaintiff does not name Rockland County or the Town of Haverstraw as a defendant," and *alternatively* holding that, even if his complaint were to be "construed to allege *Monell* liability" against these entities, such claims would still fail), *report-recommendation adopted by*, 2012 WL 1059674 (S.D.N.Y. Mar. 29, 2012) (Rakoff, J.).

Nor could any such claims be brought against the SCPD and the SCPA, as mere "department[s] of [Suffolk] County."  *See Manning v. Cnty. of Westchester*, No. 93 Civ. 3366, 1995 WL 12579, at *2 (S.D.N.Y. Jan 5, 1995) ("[T]he caption of this action is amended to remove the 'Westchester County Police Department' since the real party in interest, the County of Westchester, is already a named defendant [in this Section 1983 case].");  *see also Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999) ("Under New York law, departments such as the Town of Harrison Police Department, which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued. . . . The Town of Harrison is named as a Defendant in this [Section 1983] action, and the Town is the real party in interest." (citations omitted)).

Even if the Complaint properly asserted a *Monell* claim against Suffolk County, Plaintiffs have otherwise failed to adduce actual evidence of any Suffolk County "policy" that resulted in the "single incident of unconstitutional activity" in which Defendants were allegedly involved.  *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (Rehnquist, J.).  Rather, the actual evidence solely relates to the alleged "incident" itself.

II.   <u>Discussion</u>

    A.  *Standard of Review*

       1.  Summary Judgment

To obtain summary judgment in their favor on a "claim or defense" in this case, Defendants, as the moving parties, must demonstrate that "there is no genuine dispute as to any material fact," and that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). This standard imposes the initial burden on Defendants to show the absence of any disputes involving facts relevant to that claim or defense, which would allow a "reasonable jury" to "return a verdict for" Plaintiffs, as the non-moving parties.[13]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White, J.); *see Adickes*, 398 U.S. at 159-60 (the moving party's "initial burden").  In other words, Defendants satisfy their burden by showing that the facts favoring Plaintiffs are insufficient to establish a "genuine issue for trial," because no possible jury would find in Plaintiffs' favor with respect to that claim or defense.  *Anderson*, 477 U.S. at 249.  Facts which are "merely colorable" or "not significantly probative," or amount to a "scintilla . . . in support of [Plaintiffs'] position," are insufficient.  *Id.* at 249, 252.  Where, however, "reasonable minds" of a jury might "differ as to the import of the evidence," and thus disagree over which party should prevail on that claim or defense, summary judgment in Defendants' favor is improper.  *Id.* at 250-51.

---

[13]      With respect to a claim for which Plaintiffs "bear the burden of proof at trial," such a showing as to *any* "essential element" of that claim "necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Rehnquist, J.), and entitles Defendants to summary judgment, *unless* Plaintiffs subsequently "com[e] forward with evidence that would be sufficient, if all reasonable inferences were drawn in [their] favor, to establish the existence of that element at trial," *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994).

Once Defendants meet their burden, Plaintiffs must "do[] more than simply rely on the contrary allegation[s] in [their] complaint," *Adickes*, 398 U.S. at 160, and must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Plaintiffs "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases).

## 2. Qualified Immunity

Qualified immunity shields Defendants, as "government officials performing discretionary functions," from liability for damages under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (Powell, J.). It is an affirmative defense that Defendants bear the burden of proving. *Id.* at 815.

In determining whether this defense applies, courts often conduct a two-step analysis: first considering whether there has been no "violation of a constitutional right"; and only then considering the "qualified immunity" question of whether the right was not "clearly established at the time." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (Alito, J.) (quotations omitted). "In answering that [second] question, we look to whether (1) the right was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Bailey v. Pataki*, 708 F.3d 391, 404-405 (2d Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001) (Kennedy, J.) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."), *overruled in part on other*

11

*grounds by Pearson*, 555 U.S. 223; *Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) ("[W]hether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful." (emphasis in original)).[14]

Courts, however, "may, in [their] own discretion, refrain from determining whether a constitutional right has been violated and instead move directly to the question of qualified immunity." *Costello v. City of Burlington*, 632 F.3d 41, 51-52 (2d Cir. 2011) (Pooler, J., concurring); *see also Pearson*, 555 U.S. at 232, 236 (holding that the courts have "sound discretion" to "begin[] and end[]" their analysis with qualified immunity without deciding whether a constitutional violation existed). Such an exercise of discretion, in altogether avoiding the constitutional question, can appropriately "save[] scarce judicial resources," where "it is beyond reproach that the conduct was not objectively unreasonable in light of existing law." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012).

### B.  The Search

#### 1.  Issuance of the Warrant[15]

The Fourth Amendment, in protecting against "unreasonable searches and seizures," specifically provides that "no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV. Plaintiffs oppose summary judgment by claiming that the search warrant for Santos's

---

[14]     "There is some tension in our Circuit's cases as to whether the qualified immunity standard is of two or three parts, and whether the 'reasonable officer' inquiry is part of step two—the 'clearly established' prong—or whether it is a separate, third step in the analysis." *Bailey*, 708 F.3d at 404 n.8.

[15]     Plaintiffs have solely adduced evidence showing that Officer Zabbara, and possibly Officer Mercado, had a role in procuring the search warrant for Santos's residence.  As such, this Court construes Plaintiffs' claim involving the issuance of the search warrant against these two officers.  This claim, insofar as it is also asserted against Officer Strecker, is dismissed.

residence, as issued, lacked probable cause, in light of the alleged omissions from the affidavit. (Pls. Br., at 3-8.)  Judging by the cases on which they principally rely, Defendants' argument for summary judgment dismissing this claim sounds in qualified immunity.  (Dkt. No. 27 ("Defs. Br."), at 2-3; Defs. Reply, at 1-3.)  This Court exercises its discretion to dismiss this claim solely on that basis.

The Second Circuit has held that "the issuance of a search warrant (which depends, of course, on a finding of probable cause) creates a *presumption that it was objectively reasonable for the officers to believe that the search was supported by probable cause*."  *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (emphasis added) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *see also Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012) (Roberts, C.J.) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]").  In other words, the presumption created by the Second Circuit is that the issuance of a search warrant does not violate a "clearly established" Fourth Amendment right, because a "reasonable" officer would have considered his conduct in procuring that warrant to be constitutional; therefore, the answer to the "qualified immunity" question as to such conduct is presumably yes.

Where an officer has allegedly misrepresented or omitted information in the affidavit to support the issuance of a search warrant, he loses this presumptive "shield of qualified immunity" on summary judgment, when the application of the aptly-termed "corrected-affidavit doctrine" reveals a triable issue of fact.  *Golino*, 950 F.2d at 870-71; *Southerland*, 680 F.3d at 143-44.  The application of this doctrine involves deleting the alleged misrepresentations in, or adding the alleged omissions to, the affidavit, and determining if these deletions or additions

would have reasonably defeated the probable cause to issue that search warrant. *Velardi v. Walsh*, 40 F.3d 569, 573-74 (2d Cir. 1994) (Newman, C.J.) (citing, *inter alia*, *Soares v. Conn.*, 8 F.3d 917, 920 (2d Cir. 1993)).

Determining whether the alleged misrepresentations or omissions in the affidavit were "necessary to the finding of probable cause" is, in essence, a question about materiality. *Velardi*, 40 F.3d at 573-74. According to a line of Second Circuit cases, this materiality question is a "mixed question of law and fact": (i) the "legal component" of it is "whether the information is relevant to a given question in light of the controlling substantive law"; and (ii) its "factual component" is the "weight that a neutral magistrate would likely have given the above information."[16] *Golino*, 950 F.2d at 871-72; *accord Southerland*, 680 F.3d at 144; *Velardi*, 40 F.3d at 574. These cases represent that the "factual component" should be "resolved by the finder of fact" and not on summary judgment, unless it is undisputed that the affidavit, as corrected, could not have changed the magistrate's mind about probable cause. *Golino*, 950 F.2d at 872; *Velardi*, 40 F.3d at 574 & n.1; *accord Southerland*, 680 F.3d at 144.

---

[16]     There is a separate, and seemingly conflicting, line of Second Circuit cases that characterizes materiality in this context as more a "matter of law" than a mixed question. According to these cases, the purely *legal* question is whether no "officers of reasonable competence could disagree" that the affidavit, as corrected, would be without probable cause. If the answer is no, and at least some reasonable officers could disagree, then the alleged misrepresentations or omissions in the affidavit are immaterial as a matter of law. *Escalera v. Lunn*, 361 F.3d 737, 743-47 (2d Cir. 2004); *accord Walczyk*, 496 F.3d at 163; *Cartier v. Lussier*, 955 F.2d 841, 845-47 (2d Cir. 1992); *but see Walczyk*, 496 F.3d at 165 n.2 (Sotomayor, J., concurring) (disagreeing with "the majority's . . . reliance on whether 'officers of reasonable competence could disagree,'" but agreeing with "its conclusion that questions of disputed fact preclude judicial resolution of whether the officers are entitled to qualified immunity for their search of [the plaintiff's] house," in light of the officers' alleged omission) (Sotomayor, J., concurring). This Court is not in the position to resolve this purported conflict, nor is it required to do so: Defendants are entitled to qualified immunity on summary judgment, even under the arguably-stricter materiality standard set by the *Golino* line of cases.

This Court need not reach the "factual component" of materiality with respect to the alleged omissions in the affidavit that accompanied the search warrant for Santos's residence. These omissions—all of which were about the unavailability of proof that Santos himself participated in the same drug organization as his brothers—were *legally irrelevant*. *See Velardi*, 40 F.3d at 574 ("[T]he alleged misrepresentations must be legally relevant to the probable cause determination[.]"); *Soares*, 8 F.3d at 921 ("[S]uch information is simply irrelevant to the question whether there was probable cause[.]").

Nothing about the affidavit implicated Santos's involvement in the drug organization, let alone relied on such an implication to show probable cause. *Velardi*, 40 F.3d at 575 (holding that any alleged omissions of the fact that "[an occupant of the residence to be searched] had not been seen armed or that no alleged drug transactions had taken place at the residence to be searched" were immaterial, as "[t]he affidavits [for the search warrant] did not imply that [the occupant] was armed or was dealing narcotics in his home"). Nor was it necessary to directly implicate Santos in procuring the search warrant, because the affidavit demonstrated "probable cause to believe that evidence of the . . . narcotics business would be found at" Santos's residence based on evidence that *other* participants in the drug organization used his residence to run their business. *Id.* at 574.

By arguing that the affidavit's alleged omissions regarding evidence that "tended to exonerate" Santos were "relevant to a determination of probable cause for the search" (Pls. Br., at 6), Plaintiffs blur the distinction between the probable cause for issuing search warrants, as opposed to arrest warrants: "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (White, J.).  The fact that Santos did not participate in drug-related activities was irrelevant to the role that his residence played in facilitating these activities, which provided the probable cause to search the premises.

Plaintiffs cite the portion of Officer Zabbara's testimony, in which he stated that information calling into question Santos's involvement was omitted, insofar as it did not "establish[] probable cause" for the search warrant.  (Pls. Br., at 4.)  Plaintiffs' apparent purpose for citing this testimony is to foster the false impression that, in declining to include information that did not support probable cause, Officer Zabbara necessarily omitted information that defeated it.  The information that Officer Zabbara omitted, however, neither supported nor defeated probable cause in this case.  Significantly, Officer Zabbara clarified that a lack of probable cause to arrest Santos is "not what normally goes in" an affidavit to search his residence.  (Pls. Ex. G, at 37.)  Officer Zabbara explained that, even though he "didn't have the probable cause to believe that [Santos] was directly involved," he did have the probable cause to believe that "people involved in the conspiracy," such as the other Santos brothers, had been using Santos's residence to conduct drug-related activities.  (*Id.* at 81-82.)  Officer Zabbara observed that, as such, "it really wouldn't matter if [Santos] was there or not" for any drug-related "meets" at his residence.  (*Id.* at 32.)  In short, Officer Zabbara omitted information as to whether Santos was involved in his brothers' drug organization, but only because such information had no bearing whatsoever on the probable cause to search Santos's residence.

Accordingly, as these alleged omissions were irrelevant, their addition to the affidavit would not have defeated probable cause and thus would not have been entitled as a matter of law to any weight from the New York Supreme Court judge issuing the search warrant.  As such, the "corrected-affidavit doctrine," as applied in this case, does not create a single triable issue

sufficient to overcome the presumption that Defendants' liability in obtaining the search warrant should be precluded by qualified immunity. This Court therefore dismisses, on the basis of qualified immunity, Plaintiffs' claim involving the issuance of the search warrant.

2. Execution of the Warrant[17]

Even where a search warrant was lawfully issued, the Fourth Amendment's protection against "unreasonable searches and seizures" would still apply to "ensure reasonableness in the *manner and scope* of searches and seizures that are carried out" pursuant to that search warrant. *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994) (Newman, C.J.) (emphasis added), *abrogated on other grounds by Wilson v. Layne*, 526 U.S. 603 (1999) (Rehnquist, C.J.); *see also Zurcher*, 436 U.S. at 559-60 (declining "to assert that searches, however or whenever executed, may never be unreasonable if supported by a warrant issued on probable cause"). In their opposition brief,[18] Plaintiffs claim that, after storming into Santos's residence, the SCPD officers

---

[17] Plaintiffs have not adduced, nor does the record reflect, any evidence demonstrating that Defendants personally participated in securing entry to search Santos's residence, which constitutes the basis for Plaintiffs' claim involving the execution of the search warrant. Such action was taken by other SCPD officers in the Emergency Services Section alone. At best, this Court construes this claim against Officers Zabbara and Mercado, because the record raises at least a triable issue as to these two officers' control over the logistics for carrying out the search. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (Newman, C.J.) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983. . . . [A] defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected liberty interests[.]" (quotations omitted)); *accord Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011) (holding that the officers of one police department were not "integral participants" in a search involving flashbang devices as carried out by the officers of another police department, where the former "neither had tactical command over service of the warrant on the [plaintiffs'] residence nor supervised the [latter] in their execution of the warrant"). This claim, insofar as it is also asserted against Officer Strecker, who was present for but exercised no control over the initial entry, is dismissed.

[18] Plaintiffs, in their opposition brief, do not claim that the execution of the search warrant was unreasonable, based on allegations that the SCPD officers did not knock or announce and broke down the door to Santos's residence; accordingly, to the extent that they were asserted in

unreasonably executed the search warrant by deploying a "flashbang device or concussion grenade."[19]  (Pls. Br., at 8-9.)  Defendants expressly argue that they are entitled to summary judgment dismissing this claim, both on the merits *and* on the basis of qualified immunity. (Defs. Reply, at 3-4, 6.)  As with Plaintiffs' prior claim, this Court precludes their present claim based on qualified immunity, without resolving whether, in carrying out the search, the SCPD officers' deployment of a flashbang device under the circumstances was "unreasonable" and therefore violated the Fourth Amendment.

"An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."  *Pearson*, 555 U.S. at 243-44.  As a starting point to assessing whether an officer violated a Fourth Amendment right "clearly established" by law at the time he acted, the Second Circuit "puts significant weight on whether or not the law was governed by controlling precedent of this Circuit."  *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998).  This assessment, however, does not end there:  even in the absence of Supreme Court and Second Circuit precedent, "[d]ecisions of other circuits also may indicate whether the law was clearly established."  *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997).  Additionally, it could be "obvious from the general principles of the

---

the Complaint, these claims are considered abandoned.  *See, e.g.*, *Avola v. Louisiana-Pacific Corp.*, No. 11-CV-4053, 2013 WL 4647535, at *5 (E.D.N.Y. Aug. 28, 2013) (Chen, J.) (collecting cases).  The same is true of any such claim based on the allegation that the SCPD officers "pointed guns at Jose M. Santos, Jeny Santos, S.S., J.S. and Giselle Santos" (Pls. Br., at 8), which Plaintiffs merely mention but do not discuss.  *See Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565, 567 n.1 (2d Cir. 2011) (per curiam) ("Because the briefs lack meaningful argument relating to any other claims . . . , we treat those issues as abandoned." (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998))).

[19]      Justice Souter, sitting by designation on the First Circuit, recently described a flashbang device as a "non-lethal grenade that explodes with a stunning combination of light and noise, to freeze the inhabitants of the house at the moment the police enter."  *U.S. v. Lopez Garcia*, 672 F.3d 58, 62 (1st Cir. 2012) (Souter, J.).

Fourth Amendment that the conduct of the officers . . . violated the Amendment," without any "pre-existing law" in this and other Circuits.  *Wilson*, 526 U.S. at 615-16.

The question for this Court is, when Santos's residence was searched in May 2009, did the law "clearly establish[]" that the deployment of a flashbang device in similar situations violated a right under the Fourth Amendment to be free from "unreasonable searches and seizures"?  This Court has not found, and the parties have not cited, any Supreme Court or Second Circuit cases that recognize this right.  Indeed, one of the two District Court decisions cited by Plaintiffs, and discussed below, conceded that "binding precedent from the U.S. Supreme Court or the Court of Appeals for the Second Circuit does not exist" concerning the constitutionality of flashbang devices.  *Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 387 (D. Conn. 2006).

Nor have the other Circuits concluded that their precedents plainly prohibit the deployment of flashbang devices.  *See, e.g.*, *Bing v. City of Whitehall*, 456 F.3d 555, 570 (6th Cir. 2006) ("[The plaintiff's] right not to endure a second flashbang device in these circumstances, however, was not 'clearly established.'  The Supreme Court has not clearly established such a right, nor has this court or other circuits."); *Escobedo v. Bender*, 600 F.3d 770, 786 (7th Cir. 2010) (conceding that "the contours of the constitutional implications of the use of 'flash bang' devices in general is not clear," and citing the "relative paucity of judicial holdings forbidding the use of flash bang devices as compared to other more fully developed areas of Fourth Amendment jurisprudence"); *Boyd v. Benton Cnty.*, 374 F.3d 773, 783 (9th Cir. 2004) ("[W]ithout any guidance from this Circuit and an absence of non-binding authority that otherwise clearly establishes the right, the officers here were not put on sufficient notice that using a flash-bang [device] in these circumstances was unconstitutional."); *Kirk v. Watkins*, No.

98-7052, 1999 WL 381119, at *4 (10th Cir. June 11, 1999) (holding that, even though the officer

"threw the flashbang device into the [plaintiffs'] bedroom without looking," his conduct "did not

violate clearly established law").

Certainly as of May 2009, there appeared to be ambiguity, at best, among the other

Circuits on the answer to this constitutional question.  Some Circuits—such as the First, Seventh,

Eighth, and Tenth Circuits—declined to rule that the use of these devices was unconstitutional.

*See, e.g.*, *U.S. v. Boulanger*, 444 F.3d 76, 84 (1st Cir. 2006) ("[W]e believe that the officers'

manner of entry [to search a residence for Oxycontin], including the use of the battering ram and

flash-bang grenade, was reasonable."); *Molina v. Cooper*, 325 F.3d 963, 973 & n.6 (7th Cir.

2003) (holding that, in searching the residence occupied by the "head of a drug distribution

organization," the officers acted reasonably in deploying flashbang devices, because these

devices "were not used in the presence of [his wife] or the children" who were in a different

room and "no one was harmed by" these devices, and noting that "we have voiced reservations

about the use of these devices in recent cases, although we have not gone so far as to find their

use unconstitutional"); *U.S. v. Baker*, 16 F.3d 854, 855-56 (8th Cir. 1994) (affirming "the district

court's finding that the police reasonably believed the use of distraction devices was needed to

effect a safe entry" to search a residence for crack cocaine, where these devices were "used

without injury"); *Kirk*, 1999 WL 381119, at *2, 4 (holding that "the use of a flashbang device in

this case did not, in and of itself, constitute a violation of the [plaintiffs'] Fourth Amendment

rights," in light of the "dangers the officers believed they faced" in conducting a no-knock search

of a residence containing drugs and guns, despite the fact that the device "started a fire which

burned the [plaintiffs]").

Other Circuits—like the Third, Sixth, and Ninth Circuits—sought to restrict such use by ruling that it violated the Fourth Amendment, but only in situations where these devices were deployed knowing that serious injury to individuals would, *and did*, occur.  *See, e.g.*, *Smith v. Marasco*, 430 F.3d 140, 146, 151-52 (3d Cir. 2005) (holding that not only was the officers' use of flashbang devices in seizing the plaintiff unconstitutional, but also "a reasonable officer would have recognized" that it was, based on their "knowledge of [the plaintiff's] medical condition" from which he died as a result); *Bing*, 456 F.3d at 569-70 (holding that, in carrying out a "de facto house arrest," the police's use of the first flashbang device was "reasonable," but that their use of the second flashbang device probably was not, because they knew that this device would start a fire which "posed a mortal threat" and subsequently killed the plaintiff); *Boyd*, 374 F.3d at 778-79 (holding that, in the context of a search, it was unreasonable to "throw [the flashbang device] 'blind' into a room occupied by innocent bystanders," where one of those bystanders "suffered burns on her forearm when the device ignited").

Even if the second set of Circuit decisions sufficed to establish the "contours," or some semblance, of a Fourth Amendment right against flashbang devices in the above situations, *Anderson v. Creighton*, 483 U.S 635, 640 (1987) (Scalia, J.), such a situation does not exist in this case.  Not a "scintilla" of evidence on summary judgment suggests that the SCPD officers deployed a flashbang device knowing that they would injure, and in fact injured, Santos and his wife and children.  Nor does that evidence even suggest that anyone was in the area where the flashbang device went off.

In sum, at the time that the SCPD officers searched Santos's residence, the "state of the law" in this and other Circuits—addressing whether their conduct in deploying a flashbang device, *without* injuring, or disregarding a known risk of injuring, any of the residents, was

21

unconstitutional—remained "undeveloped." *Wilson*, 526 U.S. at 617.  Indeed, the state of the law in this area is still unsettled.  In light of this fact, "the officers in this case cannot have been expected to predict the future course of constitutional law." *Id.* (quotations omitted).  These officers thus did not, based on any "clearly established law," violate a right under the Fourth Amendment.

Plaintiffs cite only two District Court decisions from this Circuit, in claiming that the SCPD officers' deployment of a flashbang device was unconstitutional.  (Pls. Br., at 8.)  These decisions, one of which is unpublished, cannot possibly satisfy the "clearly established" standard.  *Wilson*, 526 U.S. at 616 (holding that "the parties have only identified two unpublished District Court decisions," which "cannot 'clearly establish' that [the disputed conduct] violates the Fourth Amendment").  Even if they could satisfy this standard, any Fourth Amendment right "clearly established" by these decisions is inapplicable in this case.

In *Taylor v. City of Middletown*, 436 F. Supp. 2d 377 (D. Conn. 2006), the only published decision cited by Plaintiffs, the court considered if certain officers, in conducting a search for cocaine at the plaintiffs' residence, "unreasonably violated clearly established law" by deploying a flashbang device that injured the plaintiffs.  *Id.* at 379-80, 387.  According to the court, a jury could find that such a violation had occurred, as the evidence suggested that the officers "intended to throw the device at" the plaintiffs.  *Id.* at 386.  Although the court acknowledged the absence of any precedent precisely on point, it was unable to "conceive of a set of circumstances that would permit an officer, contrary to the intended use of the device, to throw a flash-bang device directly at a person." *Id.* at 387.  Put simply, the court concluded that such conduct, despite the fact that no prior decisions deemed it unconstitutional, contravened a "general constitutional rule." *Id.* (quotations omitted).

As a secondary point, the court in *Taylor* also distinguished the case as one involving the "calculated decision to use a non-lethal explosive device as a preemptive measure, *which caused actual physical injury*." *Id.* at 383 (emphasis added).  In cases where a similar decision did not cause any injury, other courts have held that such conduct "does not even invoke the protection of the Fourth Amendment." *Id.* at 383 & n.2.  Indeed, this distinction appears also to reflect the Circuit decisions cited above.

The second decision cited by Plaintiffs, *Guizan v. Town of Easton*, No. 09-CV-1436, 2012 WL 3775876 (D. Conn. Aug. 29, 2012), which is unpublished, solely cited *Taylor* to support its sweeping conclusion that the "law regarding the use of flashbangs" was "clearly established" by "clear principles," though not by "specific precedent." *Id.* at *15 (citing *Taylor*, 436 F. Supp. 2d at 387).  In *Taylor*, however, the only right recognized as "clearly established" was against the deployment of flashbang devices specifically aimed at someone.  The court in *Guizan* instead submitted that *Taylor* stood for the proposition that *any* challenge to these devices—whether or not they targeted individuals—could survive summary judgment based on qualified immunity, because their use is clearly "subject to the same Fourth Amendment reasonableness analysis as other applications of force by police officers." *Guizan*, 2012 WL 3775876, at *15.  In so doing, the court construed *Taylor*'s holding too broadly.

The precise, and much narrower, holding in *Taylor* is instructive:  by supposedly targeting, and thereby striking, the plaintiffs with the flashbang devices, the officers in that case potentially violated a right "clearly established" by the "general principles of the Fourth Amendment," *Wilson*, 526 U.S. at 615-16, and, as such, were not entitled to qualified immunity on summary judgment.  The SCPD officers in this case did not engage in the same egregious conduct, and this Court is not compelled to reach the same conclusion.  As stated earlier, neither

23

Santos, nor his wife and children, suffered injuries as a result of the flashbang device deployed at their residence.  Additionally, there is not even a "scintilla" of evidence that the SCPD officers, in deploying this device, directed it at, or intended to harm, anyone inside Santos's residence.

Because the SCPD officers' deployment of a flashbang device was not unconstitutional as a matter of "clearly established law," summary judgment, as a matter of law, based on qualified immunity, is appropriate.  This Court therefore dismisses Plaintiffs' claim, which entails the execution of the search warrant by the SCPD officers.

### C. Scope of the Seizure

The Fourth Amendment further provides that reasonable searches and seizures shall be conducted pursuant to warrants that "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  This requirement restricts the scope of warranted searches and seizures, by "mak[ing] general searches . . . impossible and prevent[ing] the seizure of one thing under a warrant describing another."  *Marron v. U.S.*, 275 U.S. 192, 196 (1927) (Butler, J.).  Plaintiffs oppose summary judgment on their claim that, in searching and subsequently seizing fighting roosters from the shed behind Santos's residence, Officers Mercado and Strecker acted unreasonably, as they "exceeded the scope of the search warrant" which did not list the "roosters seized during the search."  (Pls. Br., at 10.)  Defendants contend that summary judgment on the merits of this claim is justified by the fact that they were permitted to search the shed where the roosters seized were "in plain view."  (Defs. Reply, at 5; *see* Defs. Br., at 4.)  This claim must be dismissed, as no jury could possibly find for Plaintiffs.

A search warrant authorizes an officer to search the areas "defined by the warrant's description of the premises and the objects of the search, and by the places in which the officer[] ha[s] probable cause to believe those objects may be found."  *U.S. v. Kyles*, 40 F.3d 519, 523 (2d Cir. 1994) (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (Stevens, J.)).  Plaintiffs do not

expressly argue that Officers Mercado and Strecker lacked the authority to search the shed, and, even if they did, this argument is unavailing. The search warrant for Santos's residence authorized the SCPD officers to search for evidence of drug-related activities throughout the "entire premises," which included not only the residence itself but also the fenced-in property on which it sat. (Defs. Ex. C, at 1.) Such authorization clearly contemplated that the search warrant would cover the property *behind* the residence, as well as in front. Since the shed was situated within this area, Officers Mercado and Strecker were also authorized to search it. The officers suspected, in light of the extension cord that stretched between the residence and the shed, that the shed contained something illegal, including but not necessarily limited to items related to the investigation.

In *U.S. v. Griffin*, 827 F.2d 1108 (7th Cir. 1987) (Coffey, J.), the circuit court found that the search warrant "expressly authorize[d] a search of 'the premises,'" even though it also referenced the residence and garage. *Id.* at 1113-15. As such, it too held that the officers had reasonably searched, and seized evidence from, the backyard and shed, because a legitimate search would "extend to *every part of the premises as specifically related in the language of the search warrant* in which the object of the search . . . 'may be found.'" *Id.* (emphasis added). *See also U.S. v. Earls*, 42 F.3d 1321, 1326-27 (10th Cir. 1994) (holding that "[t]he warrant authorizing the search of the premises including the residence on that particular premises permitted the search of the outbuildings," *i.e.*, the "detached garage, detached office, and shed"); *U.S. v. Pugh*, No. 302-CR-69, 2003 WL 21220333, at *3 (D. Conn. May 21, 2003) ("Courts have interpreted the scope of a warrant that defines a residence broadly as including not just the residence itself, but also the land on which the residence sits as well as certain other structures on that land."). The situation in this case is substantially similar to the one in *Griffin*.

25

When searching among the areas authorized by a search warrant, an officer may encounter, and then seize, evidence "in plain view," whose illegality is "immediately apparent," even if such evidence is not otherwise specified in the warrant as something to be searched for. *Horton v. Cal.*, 496 U.S. 128, 134-35, 142 (1990) (Stevens, J.); *see also Ruggiero v. Krzeminski*, 928 F.2d 558, 561-62 (2d Cir. 1991) (describing the "'plain view' doctrine" after *Horton*). The fact that an officer already knows, before searching these areas, that he will find plain-view evidence beyond the object of the search is irrelevant. *Horton*, 496 U.S. at 140 (holding that "no additional Fourth Amendment interest is furthered by requiring that the discovery of [plain-view] evidence be inadvertent").

In this case, Officers Mercado and Strecker searched the shed, which they were authorized to do, as they suspected that it contained something illegal. Though the officers could have believed that they might come across more than mere evidence covered by the search warrant, they were allowed to seize such evidence, as long as it was "in plain view" and its illegality was "immediately apparent." The roosters seized from the shed were in boxes, but they were out in the open. The razor-blade bracelets around the roosters' legs and their "surgically removed" waddles signaled to the officers that the roosters were possessed for the illegal purpose of animal fighting. Under the plain-view doctrine, it was reasonable for the officers to subsequently seize the fighting roosters.

Thus, since Officers Mercado and Strecker searched the shed pursuant to the search warrant pertaining to the "entire premises" of Santos's residence, they reasonably seized the roosters, which were obviously illegal. Plaintiffs' claim that the search and subsequent seizure

of the fighting roosters from the shed was unconstitutional is without merit, such that no jury could find for them.  This Court therefore dismisses this claim.[20]

III.    Conclusion

This Court GRANTS Defendants' Motion, and dismisses with prejudice all claims against them.  The parties shall bear their own costs and fees.  The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED:


/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: October 28, 2013
         Brooklyn, New York

---

[20]     Even if this Court were to conclude that the scope of the search and seizure with respect to the shed was unconstitutional, it would still conclude that Officers Mercado and Strecker could not have known that their conduct contravened "clearly established" law.  In short, they are also entitled to qualified immunity.